UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------

NOTOS NAVIGATION OVERSEAS S.A

'09 CIV 7989

                        Plaintiff,              09 CV

-v-

**VERIFIED COMPLAINT**

DEOL MARINE SERVICES; SHIVNATH
RAI HARNARAIN (INDIA) LTD, a/k/a SHRI
LALMAHAL LTD; and KANNU EXPORTS

                        Defendants.

--------------------------------------------------------------x

Plaintiff, NOTOS NAVIGATION OVERSEAS S.A, (hereinafter "NOTOS"), as and for

its Verified Complaint against Defendants DEOL MARINE SERVICES., (hereinafter

"DEOL"); SHIVNATH RAI HARNARAIN (INDIA) LTD, a/k/a SHRI LALMAHAL

LTD (hereinafter "SHIVNATH" or "SHRI LALMAHAL") and KANNU EXPORTS

(hereinafter "KANNU") alleges and pleads as follows:

## JURISDICTION

1.      The Court has subject matter jurisdiction as the underlying claims herein

are admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules

of Civil Procedure and within the admiralty and maritime jurisdiction of this Court under

28 U.S.C. § 1333.

## THE PARTIES

2.      At all times material hereto, Plaintiff, NOTOS was and still is a

corporation organized under the laws of the Republic of Panama and at all times material

hereto was the owner of the Panamanian flag  M/V  VOLISSOS POWER (hereinafter

occasionally referred to as "the vessel").

1

3.      At all times material hereto, Defendant, DEOL was an incorporated or unincorporated business enterprise with a business address at 23 G Gupta Complex, Old Rohtak Road, Inderlok, New Delhi 110035, India.

4.      At all times material hereto, Defendant, SHIVNATH, was and still a company or other business entity organized in India with a business address at Shri Lal Mahal House, B 6 Bhagwan Dass Nagar, New Delhi 110026, India.

5.      At all times material hereto, Defendant, KANNU is a business entity with a business address at 4098 Naya Bazar, New Delhi, India – 110006.

## FACTS AND CLAIMS

6.      On or about June 22, 2008 Plaintiff NOTOS as owner, time chartered the vessel to Defendant DEOL as time charterer under an amended charterparty in the New York Produce Exchange, ASBA layout form, ( the "charter party") for one time chartered trip from Kakinada, India to Chitagong, Bangladesh.   *A copy of the charter party is hereto attached as EXHIBIT 1.*

7.      The agreed daily time charter hire was US $21,500 payable every 15 days in advance.  The agreed prices of bunkers on delivery and redelivery were respectively US $630 per metric ton for Intermediate Fuel Oil and US $1,250 per metric ton for Marine Gas Oil.

8.      Under the express provisions of the charter party (charter party Clause 8) DEOL was obligated to load as well as discharge all cargoes and to clean the holds after completion of discharge, or pay US $ 3000 in lieu thereof (charter party Clause 36).

9. Also under the express provisions of the charter party, specifically as regards cargo damage from trading in ports of Bangladesh, DEOL undertook: to be liable for all claims of damage and shortage; to provide security to claimants for the release of the vessel from arrest or detention; and to pay NOTOS' legal defense costs. (charter party Clause 27).

10. After loading a full cargo of rice in bags the VOLISSOS POWER sailed for Chittagong where she arrived on September 21, 2008. Discharging proceeded at a slow pace owing to numerous problems with the quality and condition of the cargo; loss or damage to same due to poor handling by DEOL's stevedores; and adverse weather.

11. On November 23, 2008 at 18:00 hrs, when the vessel still had about 744 metric tons of cargo on board, DEOL wrongfully declared the vessel to be off-hire and purported to deliver her back to NOTOS.

12. On November 24, 2008 DEOL, acting through its local Chittagong port agents refused to continue discharging the cargo that remained onboard, and demanded NOTOS to pay purported cargo loss, damage, and extra handling claims in excess of US $8,000,000 - in complete breach of DEOL's express contractual obligations under the charter party.

13. To enforce its unlawful demands against Plaintiff DEOL, on or about November 25, 2008 acting by and through its local port agents, who were also the agents of Defendant SHIVNATH, caused the vessel to be removed from her discharging berth to the anchorage; placed guards on board; and withheld the vessel's sailing clearance. As a result of the actions of these Defendants the VOLISSOS POWER was unlawfully

detained and virtually held for ransom for 188.44 days, until her owners were forced to accede to the demands of the said Defendants.

14.    On March 1st, 2009, having no other reasonable alternative NOTOS settled, without prejudice, the demands of DEOL and the cargo shippers for the total amount of US $340,500.00 reserving all of its rights otherwise. Even so, the discharging of the vessel was not completed until more than one month later i.e. on April 3, 2009 at 1800 hrs. Throughout the period of the unlawful detention of the VOLISSOS POWER, and until completion of discharge at Chittagong, Defendant DEOL did not pay any charter hire or reimburse the owners for bunkers consumed or for any other amounts payable under the charter party.

15.    As a result of the breach of the charter party, Plaintiff has sustained damages in the total approximate amount of US $ 4,907,470.26 calculated as follows:

(A) Unpaid Charter hire for 188.44 days
............................................................................. $ 3,845,361.00

(B) Unpaid bunker expenses (IFO and MGO).......................... $   621,852.71

(C) C.P. clause 14 reimbursements ...   ........................   $       7,337.60

(D) Payment of cargo claim ...................….....……. ...........$   340,000.00

(E) Correspondents /survey expenses................................. $     58,050.00

(F) Legal expenses (BDT 272,000)                                    $       3,970.80

(G) Re-delivery with unclean holds ......................................$       3,000.00

(H) Claim for Port Captain and Owners extra travelling
       and ancillary expenses...   .......................................$     27,898.15

TOTAL                                                           $ 4,907,470.26

16.    Despite repeated demands for payment by NOTOS, DEOL has failed, neglected and/or otherwise refused to pay the outstanding amounts now due and owing. under the charter party and the sum of US $4,907,470.26 remains unpaid.

## CORPORATE IDENTITY OF DEFENDANTS

17.    Though Defendant DEOL in the charter party negotiation represented itself as an Indian business entity, a search of the incorporation records in India has not disclosed a corporate entity by this name.

18.    Notwithstanding the fact that the Charterer of the VOLISSOS POWER was the Defendant DEOL, payments of charter hire were not being made by DEOL but via KANNU, a "paying agent", i.e. a foreign company which was not the charterer of the vessel, had no apparent connection to the time charterer DEOL, and had no contractual or other relationship with Plaintiff, but is used as a "pocket" from which to pay the obligations of the purported Indian business enterprise DEOL. *(A copy of the bank transfer orders of KANNU is hereto attached as Exhibit 2).*

19.    In addition, Defendant SHIVNATH has made similar payment on behalf of DEOL pursuant to charter parties unrelated to the instant action even when there is no contractual obligation to do so.

20.    Upon information and belief, the proprietor of DEOL, is none other than Defendant SHIVNATH.

21.    Upon information and belief DEOL is one of several companies that include Defendants SHIVNATH and KANNU which are operated, controlled and managed as a single economic enterprise (hereinafter "SHIVNATH GROUP").

22.     Upon information and belief, among the companies that comprise the SHIVNATH GROUP, business is not conducted at arms' length and /or proper formalities are not observed.

23.     Defendants DEOL, KANNU and SHIVNATH are alter egos of each other because they disregard the purported separateness of DEOL and pursue its business as if it was their own.

24.     Upon information and belief Defendant DEOL is a shell-business entity through which the defendants SHIVNATH and KANNU conduct their business.

25.     Upon information and belief Defendant DEOL has no separate identity from Defendants SHIVNATH and KANNU.

26.     Upon information and belief, among the business entities that are part of the SHIVNATH Group, including the Defendants SHIVNATH, DEOL, and KANNU, there is common control and management and it includes one Harnarain Aggarwal who is chief executive officer or person in charge of SHIVNATH and KANNU.

27.  Upon information and belief, Shivnath Ltd and Shivnath Group might have ceased conducting business in their own names and are now conduct business under Shri Lalmahal's name.

28.     Upon information and belief, Defendants SHIVNATH a/k/a/ SHRI LALMAHAL, and KANNU are "paying/receiving agents" or "pass through" entities for the "SHIVNATH GROUP" and specifically as to Defendant DEOL, are used as intermediaries for the purpose of insulating the latter from the demands of its creditors, particularly the shipowners from whom this Defendant charters-in tonnage.

29.    It is not a general practice in the marine shipping industry for companies with no contractual engagement to the owners of a vessel to pay the charter hire obligations owed to the owner by the charterer of the vessel. Payments remitted or received on behalf of a contractually unrelated company strongly suggest a relationship that is not at "arm's" length".

30.    Defendant DEOL's having systematically made payments of charter hire from and through the bank accounts of another company i.e. KANNU, and in other cases SHIVNATH, evidences commingling of the funds of these business entities.

31.    Based on the foregoing, as well as other activities of the defendants of the SHIVNATH a/k/a SHRI LALMAHAL, KANNU, and DEOL, the said Defendants should be considered a single economic unit with no corporate distinction among them, rendering them liable for the debts of each other and subject to attachment and garnishment of their property found in the District.

32.    Based on the foregoing investigation, there are reasonable grounds to conclude that the Defendants SHIVNATH a/k/a SHRI LALMAHAL and KANNU are the alter-egos of Defendant DEOL and, therefore, Plaintiff NOTOS has a valid prima facie *in personam* claim against Defendants SHIVNATH a/k/a SHRI LALMAHL and KANNU based upon alter ego liability.

## PROCEEDINGS ON THE MERITS

33.    Pursuant to the terms of the charter party agreement, (additional charter party Clause 45) all disputes arising thereunder are to be submitted to London arbitration with English law to apply.  Plaintiff has already commenced arbitration in London.

34.    This action is brought in order to obtain jurisdiction over Defendant and also to obtain security for Plaintiff's claims and in aid of London arbitration proceedings.

35.    English law, including but not limited to Section 63 of the English Arbitration Act of 1996, provides that a prevailing party is entitled to interest, costs and legal fees.

36.    As best as can now be estimated, the Plaintiff, NOTOS expects to recover the following amounts in London Arbitration from Defendant DEOL:

| | | |
|---|---|---|
| A. | Principal claim: | $ 4,907,470.26 |
| B. | Estimated interest on principal claim: 3 years at 7.5%, compounded quarterly | $ 1,225474.74 |
| C. | Estimated attorney's fees: | $ 120,000.00 |
| D. | Estimated arbitration costs: | $ 120,000.00 |
| | **Total Claim** | **$ 6,372, 945.00** |

37.    Therefore, NOTOS' total claim for breach of the maritime contract against Defendant DEOL is in the aggregate USD $ 6,372, 945.00.

<u>BASIS FOR ATTACHMENT</u>

38.    Defendants, DEOL, SHIVNATH  a/k/a SHRI LALMAHAL and  KANNU cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendant are believed to have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or

for the benefit of, the Defendant within this District held by various parties, as garnishees, including by not limited to electronic fund transfers.

39.    Defendants are continuously engaged in international shipping and conduct business in U.S. Dollars.  Nearly all companies engaged in the international shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City.  Dollars are the *lingua franca* of international commerce.

40.    All international U.S. dollar transfers are processed by intermediary banks in the United States, mainly in New York City.  The Clearing House Interbank Payment System represents that it processes 95% of those transfers.

41.    Plaintiff believes that some of these assets of Defendants, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the defendants; effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendants and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including: ABN AMRO BANK, American Express Bank, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche Bank, HSBC (USA), JPMorgan Chase Bank, Mashreqbank, Societe Generale, Standard Chartered Bank, UBS AG, U.S. Bank, Wachovia Bank,  and Wells Fargo Bank.

WHEREFORE, Plaintiff prays:

A.     That process in due form of law issue against the Defendants, citing them to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.     That since the Defendants cannot be found within the District, as set forth in the Declaration of George M. Chalos (*attached hereto as Exhibit 3*), and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of the Defendants tangible or intangible property or any other funds held by any garnishees in the district which are due and owing, or other property of, or for the benefit of, the Defendants, up to the amount of USD $ 6,372, 945.00 to secure and satisfy the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B and Rule E answer the matters alleged in the Complaint;

C.     That Plaintiff may have such other, further and additional relief as may be just and proper.

Dated: Oyster Bay, New York
September 17, 2009

CHALOS & CO, P.C.
Attorneys for Plaintiff
NOTOS NAVIGATION OVERSEAS S.A.

By: _____
George M. Chalos (GC-8693)
123 South Street
Oyster Bay, New York 11771
Tel: (516) 714-4300
Fax: (516) 750-9051
gmc@chaloslaw.com

# EXHIBIT 1

Code Name : NYPE 93
Recommended by :
The Baltic and International Maritime Council (BIMCO)
The Frderation of National Associations of
Ship Brokers and Agents ( FONASBA )



# TIME CHARTER©

New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A) , Inc*

November 6th , 1913-Amended October 20th, 1921; August 6th 1931; October 3rd1946;
Revised June 12th 1981; September 14th 1993

**THIS CHARTER PARTY**, made and concluded in  NEW DELHI
This 22ND  day of  JUNE  2008.
Between **OWNERS MESSRS NOTOS NAVIGATION OVERSEAS S.A. PANAMA**

**Disponent Owners of the Vessel described below,and DEOL MARINE SERVICES,NEW DELHI**
as Charterers

**Description of Vessel**

Name MV VOLISSOS POWER Flag  PANAMA          Built (year).  1977
Port and number of Registry
Classed        PRC                    in
Deadweight  27,023 mt    */metric* tons (cargo and bunkers, including freshwater and
stores not exceeding  metric  */metric* tons) on a salt water draft of     10.324m
on summer freeboard.
capacity  34328.74  cubic metres  grain 33424.77 cubic metres bale space.
Tonnage  16.521/ 9.546    GRT/NRT.
Speed about    ABT 12.5KTS ON ABT 27MTS IFO BALLAST/LADDEN AND ABOUT 2.5MT MDO/DAY
PORT CONSUMTION 2.5MT MDO / IDLE, GEAR WORKING 4.0MT

\* *Delete as appropriate.*

### 1. Duration
**The owners agree to let and the charterers agree to hire the Vessel from the time of delivery for one 1 tct via safe
anchorage(s), safe berth(s), safe port(s), always afloat, always within Institute Warranty Limits**
with bagged rice India to chittagong with duration about 30/40 days wog.

### 2. Delivery
  The Vessel shall be placed at the disposal of the charterers on dropping last outward pilot chittagong
**any time day or night friday
And  Holidays included**

The Vessel on **arrival at   first load port**  shall be ready to receive cargo with clean-swept
holds and tight staunch ,strong and in every way fitted for ordinary cargo service,
having water ballast and with sufficient power to operate all cargo-handling gear
Simultaneously.

Owners to tender approximate 3/1 days delivery notice to charterers

### 3. On-Off Hire Survey
~~Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their
respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct
joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition
of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without
prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.
If either party fails to have a representative attend the survey and sign the joint survey report, such party
shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.
On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.~~

**A joint on/off hire bunker and condition survey is to be carried out by a mutually independent surveyor at first load
last discharge port, The cost being shared equally , and vessel to remain on-hire during such surveys.
Owners however to have the option to appoint vessel's Master and/or Chief Engineer to jointly carry out with
Charterers'  independent surveyor the joint on/off hire bunkers and condition survey in which case each party will t
cover the cost of their own appointed surveyors.**

### 4. Dangerous Cargo/Cargo Exclusions
(a) The Vessel shall be employed in carrying lawful merchandise   excluding any goods of a dangerous,
injurious, flammable or corrosive nature ~~unless carried in accordance with the requirements or
recommendations of the competent authorities of the country of the Vessel's registry and of ports of
shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must
pass.~~ Without prejudice to the generality of the foregoing, in addition the following are specifically
excluded: ~~livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,~~
see Clause 46.

~~(b) If IMO/IMDG classified cargo is agreed to be carried, the amount of such cargo shall be limited to
tons and the Charterers shall provide the Master with any evidence he may
reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO
regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at
the Charterers' risk and expense.~~

5. **Trading Limits**

The Vessel shall be employed in such lawful trades between safe ports and safe places within
International Warranty Limits.
excluding
**See Clause 47**

6. **Owners to Provide**

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; **drinking water for domestic p
lubricating oil;** shall pay for wages, consular shipping and discharging fees of the crew and charges for port services perta
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and
equipment for and during the service, and have a full complement of officers and crew.

7. **Charterers to Provide**

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory
garbage disposal), all communication expenses pertaining to the charterers' business at cost ,customary
pilotages
towages, agencies, commissions, consular charges (except those pertaining to individual crew members
or flag of the Vessel), and all other usual expenses except those stated in **Clause 6**, but when the Vessel
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while
the Vessel is employed under this Charter Party shall be for the Charterers' account. ~~All other fumigations~~
~~shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six~~
~~months or more.~~

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard
the Vessel. Prior to redelivery the charterers shall remove their ~~dunnage~~ and fittings at their cost and
in their time.

8. **Performance of Voyages**

(a) The Master shall perform the voyages with due despatch,
and shall render all customary assistance with the vessels crew.

The Master shall be conversant with the English language and (although
appointed by the Owners) shall be under the orders and directions of the Charterers as regards
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk
and expense, under the supervision of the Master.

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if

necessary, make a change in the appointments.

**9. Bunkers**

(a) The Charteres on delivery, and the owners on delivery , shall take over and pay for all fuel and
diesel oil remaining on  board the Vessel as hereunder. The Vessel shall be delivered with:
bunkers on delivery to be  about 430 meteric tons ifo and abt 30 meteric ton mgo ( 30 metric tons guarantee to avalibale to
charters) bunker on redelivery  as on board without replenishment by charterers
 on delivery charterers to pay for estimated consumption viz 430 mt ifo and 30 mt mgo at prices of usd 630 pmt ifo and 1250
pmt mgo owners to have the option of bunkering the vessel for themselves provided same doesnot interfere with charterers
operation.charterers have the right to deduct value of estimated bunkers on redelivery from the last charter hire and if same
insufficient then from penultimate hire as well that is,from the last sufficient hire but not from 1st hire.bunker on redelivery
quantities same as bunker on delivery qunatities
any difference between estimated and actual bunker consumption to be settled between owners and
charterers promptly after redelivery together with preliminary final accounting

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines
and auxiliaries and which conform to the specification(s) as set out in Appendix A .

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed
specification(s). Additionally, if bunker fuels supplied do not conform to the mutually agreed
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker
consumption, nor for any time lost and any other consequences.

**10. Rate of Hire/Redelivery Areas and Notices**

Hire usd 21,500 daily including over time payable every 15 days in advance 1st 15 days hire plus value of estimated consun
bunker qunatty (for ifo)on delivery to be paid 3 banking days after vessel's delivery.
hundred )U.S.currency , daily including overtime 15 days in advance

commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part
of a month; hire shall continue until the hour of the day of her redelivery in like good order and condition,
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at delivery on outward safe pilot 1 safe port chittagong
friday and holidays included port in charters option

unless otherwise mutually agreed.

The Charterers shall give the Owners not less than 10/7days estimated redelivery writen notice and 5/3/2/1
notice of vessels expected date and probabale port of redelivery.

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be
adjusted to GMT.

**11. Hire Payment**

(a) *Payment*

Payment of Hire shall be made so as to be received by the owners or their designated payee in

~~in Amsterdam~~
in United States Currency, available to the
Owners
and should same not cover the actual time, hire shall be paid for the balance day by day
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)
may otherwise have on the Charterers.          See Clause 55

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire
shall continue to accrue and any extra expenses resulting from such withholding shall be for the
Charterers' account.

(b) *Grace Period*

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners
three clear banking days (as recognized at the agreed place of payment) written notice to rectify the
failure, and when so rectified within those days following the Owners' notice, the payment shall
stand as regular and punctual.
Failure by the Charterers to pay the hire within three days of their receiving the Owners' notice as
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.

(c) *Last Hire Payment*

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate
payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements
for the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the
balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be
refunded by the Owners or paid by the Charterers, as the case may be.

(d) *Cash Advances*
Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required
by the Owners, subject to 2½ percent commission and such advances shall be deducted from the hire.
The Charterers, however, shall in no way be responsible for the application of such advances.

12. **Berths**

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place  that
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat
at any time of tide.

### 13. Spaces Available

(a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,
apparel, furniture, provisions, stores and fuel.

(b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the
Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a
result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.

### 14. Supercargo and Meals

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'
risk and see that voyages are performed with due despatch. He is to be furnished with free
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of

**USD 1200 lumsum**  per month of 30 days or pro rata. The Owners shall victual pilots and customs officers, and also, wher
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,
Charterers paying at the rate of _ **for all victualling /cable charges .**
representation/entertainment expenses.  per meal for all such victualling.These items are included in the lumpsum of
     In lieu of hatch cleaning US $ 3000 as lumpsum including (including removal of dunnage plastic and karft pa
### 15. Sailing Orders and Logs

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,
showing the course of the Vessel, distance run engine rpm including changes,sea conditions(swell),wind
in beaufort scale,wind descriptions,arrival/departure seabouy,pilot on/off and the consumption of bunkers.Any log
extracts
required by the Charterers shall be in the English language.

### 16. Delivery/Cancelling

If required by the Charterers,time shall not commence before 25th june, 2008  0001 Hrs  and should the
Vessel not be ready for delivery on or before **5th july, 2008**  but not later than **2400** hours,
the Charterers shall have the option of cancelling this Charter Party.

*Extension of Cancelling*

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is
expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will
cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two
days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date
of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the

~~Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers in accordance with this Clause.~~

### 17. Off Hire

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants, agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of

hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident to the cargo or where permitted in lines 257 to 268 hereunder, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners' account. In the event of the Vessel being driven into port or to anchorage through stress of weather, trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be deducted from the hire.

### 18. Sublet

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this Charter Party.

### 19. Drydocking

The Vessel was last drydocked **in China September 2006**
~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~

*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter Party.

* Delete as appropriate

### 20. Total Loss

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once.

### 21. Exceptions

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always mutually excepted.

22. **Liberties**

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

23. **Liens**

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due under this Charter Party, including general average contributions, and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once.

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance, which might have priority over the title and interest of the Owners in the Vessel. The Charterers undertake that during the period of this Charter Party, they will not procure any supplies or necessaries or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.

24. **Salvage**

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting Owners' and Charterers' expenses and crew's proportion.

25. **General Average**

General average shall be adjusted according to York-Antwerp Rules 1974, as amended ~~1990~~,1994 or any subsequent modification thereof, in London and settled in US Dollars currency.

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules 1974, as amended ~~1990~~,1994, or any subsequent modification thereof and will include the "New Jason Clause" as per **Clause 31**.

Time charter hire shall not contribute to general average.

26. **Navigation**

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew, and all other matters, same as when trading for their own account.

27. **Cargo Claims**

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club New York Produce Exchange Agreement of 1994 ~~February 1970, as amended May, 1984~~, or any subsequent modification or replacement thereof.
The following terms shall apply in respect of all cargoes discharged or delivered at bangladesh Port(s):
(i)Notwithstanding the incorporation of the Interclub Agreement (and paragraph (3) thereof) into this C/P, the charterers are to be responsible for all claims for shortage and/or

stevedore damage and/or arising out of the loading, stowage (including vbut not limited to splitting and/or bursting of bags caused by stowage of cargo on top of them), lashing, discharge, storage or other handling of cargo and/or any condensation to cargo howsoever occuring and hereby undertake to indemnify owners and the vessel, their employees, agents, servants and sub-contractors at all times by payment on demand, against all claims, demands, liabilities and proceedings whatsoever (herein "Claims") made, found, established or brought against owners or the vessel (whether or not after termination of the period of this charter) in respect of cargo discharged at bangladesh Port(s) (whether or not such Claims are brought against the vessel, her owners or her disponent owners or their employees agents, servants or sub-contractors)and any and all costs and expenses (including legal costs and expenses) whatsoever which any of them may incur, be liable for or sustain in respect of such Claims; and  into this C/P, the charterers are to be responsible for all claims for shortage and/or

ii). The charterers further undertake that upon receiving written notification of any Claims from owners or the vessel they will take over, defend and hold harmless at their sole expense (including but not limited to the instruction of lawyers if necessary on behalf of the vessel, her owners or their employees, agents, servants or sub-contractors and the incurring of legal costs and expenses) the owners and the vessel in respect of any such Claim (whether or not such claims are brought against the vessel, her owners or their employees, agents, servants or sub-contractors) and shall keep owners and the vessel fully advised and in such format as requested by owners or the vessel the status of such claims."cargo claims due to seawater ingress resulting from deffective hatchcovers or cargo claims resulting from oil leckage from vessels oil tanks to be for owners account.charterers will seal the hatch cover on completetion of loading and sealing to be opened only on arrival at discharge port for inspection.

(iii) If, in connection with such Claim as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, o should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), the charterers hereby undertake to provide on demand such bail or other security a may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified

"all cargo claims including but not limited to any shortages to be for charterers account and owners p and i club not to be inv agreeing exact wording (a more "appropriate wording to be discussed under cp details (dealing with e.g; what happens 
if a b/l holder brings a claim directly to owners). owners are getting a suggestion from their p and i club on monday, they will include something to the effect of charters suggestion ie damages due to salt water or oil ingress from vessels tanks should not be for charters account)

## 28. Cargo Gear and Lights

The Owners shall maintain the cargo handling gear of the Vessel which is as follows:

providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also provide on the Vessel for night work lights as on board, but all additional lights over those on board shall be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which case the Vessel shall remain on hire.

29. Crew Overtime

~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,~~
~~the Charterers shall pay the Owners, concurrently with the hire per month~~
~~or pro rata.~~

30. Bills of Lading

(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates
or tally clerk's receipts. However, the Charterers and/or their agents may sign bills of lading or waybills on behalf
of the
Master ,with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts.

(b) All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency
between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master
at their request.

(c) ~~Bills of lading covering deck cargo shall be claused:"Shipped on deck at Charterers', Shippers' and no deck cargo allow~~
~~Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for~~
~~any loss, damage, expense or delay howsoever caused."~~
**(d) No liner bills of Lading to be issued under this Charter**
31. Protective Clauses

This Charter Party is subject to the following clauses all of which are also to be included in all bills of lading
or waybills issued hereunder:

(a) CLAUSE PARAMOUNT
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such
term shall be void to that extent, but no further."
and

(b) BOTH-TO-BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or
contact."

and

(c) NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.
If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."
and

(d) U.S. TRADE - DRUG CLAUSE

"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account and the Vessel shall remain on hire.
Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up the bails to secure release of the Vessel.
The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel."
And

## (e) WAR CLAUSES

"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture, seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de facto authority or any purported governmental organization maintaining naval, military or air forces).

(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not exceeding a valuation of In addition, the Owners may purchase and the
Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements, total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a government program, the Vessel shall not be required to enter or remain at any such port or zone.

(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter, or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such

port or zone assume the provable additional cost of wages and insurance properly incurred in connection with master, officers and crew as a consequence of such war, warlike operations or hostilities.

(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the Charterers' account."

## 32. War Cancellation

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries: USA, Russia,PRC, Japan,Malta , France ,U.K

Then , provided performance of the C/P is affected.
either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this Charter Party shall apply until redelivery.

## 33. Ice

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and remain in the port or area or to get out after having completed loading or discharging. Subject to the Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her size, construction and ice class.

## 34. Requisition

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid by the said government in respect of such requisition period shall be retained by the Owners. The period during which the Vessel is on requisition to the said government shall count as part of the period provided for in this Charter Party.
If the period of requisition        exceeds  three / 3  months, either party shall have the option of cancelling this Charter Party and no consequential claim may be made by either party.

## 35. Stevedore Damage

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage.

(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed and if required passed by the Vessel's classification society.

(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option, before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the Owners' work.

### 36. Cleaning of Holds

~~The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by local regulations, at the rate of USD 100 per hold.~~

The Charterers shall have the option to re-deliver the vessel with unclaen/unswept holds against a lumpsum payment of US$ 3000 lumpsum but charters to remove all dunnage/debris prior to redelivery.
If Charteres elect to redeliver with clean holds and not pay any lumpsum in lieu of hold cleaning ,
then hold condition to be as provided for in Clause 57, that is with clean swept , fresh water washed and dry holds.

### 37. Taxes

payable togeher with first hire . This amont includes payment for C/E/V in Clause 14.
Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding taxes levied by the country of the flag of the Vessel or the Owners).

### 38. Charterers' Colors

The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers shall be for the Charterers' account.

### 39. Laid up Returns

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum period of 30 days if on full hire for this period or pro rata for the time actually on hire.

### 40. Documentation

The Owners shall provide any documentation relating to the Vessel that may be required to permit the Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners' P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.

### 41. Stowaways

(a) (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining

access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

## 42. Smuggling

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.

## 43. Commissions
A commission of 3.25% each percent is payable by the Vessel and the Owners to **Brisk Marine Services and Alma Shipping  Greece**

2,50

on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

## 44. Address Commission

3.75 iac          6,25 P.S.

on hire earned and paid under this Charter.

## 45. Arbitration

(a) NEW YORK

All disputes arising out of this contract shall be arbitrated at New York in the following manner, and subject to U.S. Law:

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their

~~decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators Inc.~~
~~For disputes where the total amount claimed by either party does not exceed US $ ** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators Inc.~~

(b) LONDON

All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his action be taken before the award is made. Any dispute arising hereunder shall be governed by English Law.

For disputes where the total amount claimed by either party does not exceed **US $ 75,000.00** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

*Delete para (a) or (b) as appropriate

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions of this clause shall have full force and remain in effect.

If mutually agreed, clauses **46 to 78** both inclusive, as attached hereto are fully incorporated in this Charter Party.

MV    VOLISSOS POWER
To Charter Party dated 22ND JUNE 2008
Between Owners  NOTOS NAVIGATION OVERSEAS S.A PANAMA,  DEOL MARINE SERVICES,NEW DELHI..


~~Further details of the Vessel:-~~



**THE OWNERS** _____                    **THE CHARTERERS.**

# Additional Clauses to MV"VOLISSOS POWER" Charter Party dated 22ND JUNE, 2008

### CLAUSE 46: PERMITTED CARGOES

ONLY PERMITTED CARGO IS BAGGED RICE

### CLAUSE 47: PERMITTED TRADING AREAS

TRADING BETWEEN VISAKHAPATNAM EAST COAST INDIA ,BANGLADESH

### CLAUSE 48: OCEAN ROUTES

DURING VOYAGES SPECIFIED BY THE CHARTERERS, CHARTERERS MAY SUPPLY THE MASTER WITH THE SERVICES OF OCEAN ROUTES OR OTHER REPUTABLE INTERNATIONAL WEATHER BUREAU TO BE MUTUALLY AGREED BY OWNERS AND CHARTERERS. THE MASTER SHALL COMPLY WITH THE REPORTING PROCEDURES OF THE ROUTING SERVICES SELECTED.

EVIDENCE OF WEATHER CONDITION SHALL BE TAKEN FORM THE VESSELS DECK LOGS AND THE REPORTS OF THE SELECTED INTERNATIONAL WEATHER BUREAU. IN THE EVENT OF A CONSISTENT DISCREPANCY BETWEEN THE DECK LOGS AND THE REPORTS OF THE SELECTED WEATHER BUREAU, REPORTS OF THE SELECTED WEATHER BUREAU SHALL BE TAKEN AS RULING.

### CLAUSE 49: HAMBURG RULES

NEITHER THE CHARTERERS NOR THEIR AGENTS SHALL PERMIT THE ISSUE OF ANY BILL OF LADING, WAYBILL OR OTHER DOCUMENT EVIDENCING A CONTRACT OF CARRIAGE (WEATHER OR NOT SIGNED ON BEHALF OF THE OWNERS OR ON THE CHARTERERS BEHALF OR ON BEHALF OF ANY SUB CHARTERERS) INCORPORATING, WEATHER NOT COMPULSORILY APPLICABLE, THE HAMBURG RULES OR ANY OTHER LEGISLATION GIVING EFFECT TO THE HAMBURG RULES OR ANY OTHER LEGISLATION IMPOSING LIABILITIES IN EXCESS OF HAGUE/VISBY RULES. THE CHARTERERS SHALL INDEMNIFY THE OWNERS AGAINST ANY LIABILITY, LOSS OR DAMAGE WHICH MAY RESULT FROM ANY BREACH OF THE FORGOING PROVISIONS OF THIS CLAUSE.

### CLAUSE 50: VESSEL'S DESCRIPTION

M.V. VOLISSOS POWER

TYPE: SINGLE DECK BULK CARRIER
BUILT : 1977
FLAG : PANAMA
CALL SIGN : 3EFQ4
IMO NO: 7602924
CLASS : PRC
P+I: SOUTH OF ENGLAND
GRT/NRT INTL : 16.521/9.546
GRT/NRT PANAMA : 18158/13535
GRT/NRT SUEZ : 15042.6 / 10979.9
DWAT : 27,023
LOA: 168.90m / LBP: 159.00m
EXTREME BREADTH : 24.8m

## Additional Clauses to MV"VOLISSOS POWER" Charter Party dated 22ND JUNE, 2008

DEPTH: 14.30m
DRAFT: 10.324 SUMMER DRAFT
GRAIN CAPACITY : 34.328.74m3
BALE CAPACITY: 33.424.77m3
LIGHT WEIGHT : 6738 mt
HOLDS/HATCHES : 5/5
TYPE OF HATCH COVERS: FOLDING TYPE WEATHER STEEL HATCH COVERS OPERATED BY
HYDRAULIC HINGES CUBIC BREAKDOWN PER HOLD INCLUDING CARGO HATCH
NO.1 119,918FT3/ NO.2 310,819FT3 / NO.3 164,343FT3 / NO.4 320,454FT3/ NO.5
296,786FT3 GRAIN GRAIN CAPACITIES HOLD BY HOLD (EXCLUDING CARGO HATCH)

| HOLD | GRAIN | BALE |
| --- | --- | --- |
| | CU.M | CU.M |
| 1 | 3395.66 | 3252.32 |
| 2 | 8801.33 | 8591.80 |
| 3 | 4653.63 | 4484.02 |
| 4 | 9074.15 | 8855.80 |
| 5 | 8403.97 | 8240.00 |

HATCH SIZES:
NO.1 9.42x12.80MTRS
NO.2 25.12x12.80MTRS
NO.3 9.42x12.80MTRS
NO.4 25.12x12.80MTRS
NO.5 25.12x12.80MTRS

TANK TOP FLOOR DIMENSIONS

NO.1 14.925x24.00MTRS
NO.2 31.400x24.00MTRS
NO.3 15.700x24.00MTRS
NO.4 31.400x24.00MTRS
NO.5 29.830x24.00MTRS

TANK TOP STRENGTH MT/M2 : REVERTING

CARGO GEAR: NO.1, 2, 3, 4 CRANES 15MT SWL
NO.5 DERRICK 10MT SWL

SPEED / CONSUMPTION - ABT 12.5KTS ON ABT 27MTS IFO BALLAST/LADDEN AND ABOUT
2.5MT MDO/DAY. PORT CONSUMTION 2.5MT MDO / IDLE, GEAR WORKING 4.0MT

FUEL GRADE : IFO 180 CST RME-180 / MDO=DMB FUEL GRADES TO BE IN ACCORDANCE
WITH ISO 8217:2005(E) AND TO BE SUPPLIED IN ACCORDANCE WITH MARPOL 73/78 ANNEX
VI REQUIREMENTS (AND SUBSEQUENT AMENDMENTS).
ALL SPEEDS/CONSUMPTIONS BASIS CALM SEAS/ MAX BEAUFORT 2.
VSL IS BURNING MDO WHEN NAVIGATING AND/OR MANOEUVRING AT REDUCED RPM, IN
NARROW/ SWALLOW/ RESTRICTED WATERS (E.G. ENTERING/LEAVING PORT, TRANSITING
CANALS AND SHIFTINGS AT T/S ANCHORAGES ETC).
ALL DETAILS "ABOUT" AND WITHOUT GUARANTEE

- VESSEL'S P AND I CLUB: SOUTH OF ENGLAND

OWNERS WARRANT VESSEL WILL REMAIN P AND I COVERED FOR THE DURATION OF THIS
CHARTER

## Additional Clauses to MV"VOLISSOS POWER" Charter Party dated 22ND JUNE, 2008

OWNERS WARRANT THAT VESSEL CAN SAFELY LOAD,CARRY AND DISCHARGE A FULL AND COMPLETE CARGO OF BAGGED RICE WITH STOWAGE FACTOR OF ABT 46/48 CBFT/PMT WITH DUNNAGE (CHARTERERS ACCOUNT) FOR THE INTENDED VOYAGE FROM KAKINADA TO CHITTAGONG.

- VESSEL IS NOT DISPONENTLY OWNED AND ORIGINAL OWNERS ARE PERFORMING THE CHARTER. OWNERS ARE OWNERS ARE MESSRS NOTOS NAVIGATION OVERSEAS S.A. PANAMA AND MANAGERS ARE MESSRS FAIRPORT IN ATHENS AND MANAGERS ARE FAIRPORT IN GREECE

OWNERS BANK ACCOUNT

......?

P&I CLUB:- SOUTH OF ENGLAND

OWNERS UNDERSTAND THAT THE VESSEL SHOULD NOT BE BLACK LISTED BY CALLING IN ANY OF ISRAEL PORTS: YES

VESSEL'S PLAN & DRAWINGS OF VESSEL'S CROSS SECTION & ENDLONG SECTION: TRYING TO LOCATE THIS THROUGH MANAGERS IN GREECE

CLEAR LENGTH /BREDTH (TO LESS LADDER&ANY OTHER OBSTRUCTIONS IN HOLD ...)OF HATCH&HOLD &TANKTOP HOLD DEPTH TO HATCH COAMING &HATCH COVER ALL AS GIVEN IN HOLD DIMS

CORRUGATIONS & LADDER & OTHER OBSTRUCTIONS (IF ANY)TYPE& SIZE & ACTUAL POSITION IN HOLD  AUSSIE LADDERS ARE WITHIN THE CORRUGATIONS SO HAVE NO INFLUENCE ON CLEAR HOLD LENGTHS AS GIVEN

    A)  AGENT FULL STYLE  AT LOADPORT

```
ACT FORWARDERS STEAMER AGENCY
ACT HOUSE 31-1-16 RANGAYYA NAIDU STREET
KAKINADA-533001 A.P. INDIA
TEL   :+91 884-2384341 2363869 ,2353603,
FAX   :+91 884 2364415,
EMAIL :act@aktf.com , actforwarders@bsnl.in
PIC : MS DHANA KALE
MOBILE ::+91-94401 76463
```

    B)  OWNERS:

```
NOTOS NAVIGATION
OVERSEAS S.A. PANAMA
```

# Additional Clauses to MV"VOLISSOS POWER" Charter Party dated 22ND JUNE, 2008

C ) MANAGERS
FAIRPORT IN GREECE

CERTIFICATE COPY:
CERTIFICATE OF CLASS
DOCUMENT OF COMPLIANCE
SAFETY MANAGEMENT CERTIFICATE
LATEST PORT STATE CONTROL INSPECTION REPORT
ISSC CERTIFICATE

## CLAUSE 51: BIMCO DOUBLE BANKING CLAUSE

A)      THE CHARTERERS SHALL HAVE THE RIGHT, WHERE AND WHEN IT IS CUSTOMARY AND SAFE FOR VESSELS OF SIMILAR SIZE AND TYPE TO DO SO, TO ORDER THE VESSEL TO GO, LIE OR REMAIN ALONGSIDE ANOTHER VESSEL OR VESSELS OF ANY SIZE OR DESCRIPTION WHATSOEVER OR TO ORDER SUCH VESSELS TO COME AND REMAIN ALONGSIDE AND SUCH SAFE DOCK, WHARF, ANCHORAGE OR OTHER PLACE FOR TRANS-SHIPMENT, LOADING OR DISCHARGING OF CARGO AND/OR BUNKERING.

B)      THE CHARTERERS SHALL PAY FOR AND PROVIDE SUCH ASSISTANCE AND EQUIPMENT AS MAY BE REQUIRED TO ENABLE ANY OF THE OPERATIONS MENTIONED IN THIS CLAUSE SAFELY TO BE COMPLETED AND SHALL GIVE THE OWNERS SUCH ADVANCE NOTICE AS THEY REASONABLY CAN OF THE DETAILS OF ANY SUCH OPERATIONS.

C)      WITHOUT PREJUDICE TO THE GENERALITY OF THE CHARTERERS' RIGHTS UNDER (A)AND (B) IT IS EXPRESSLY AGREED THAT THE MASTER SHALL HAVE THE RIGHT TO REFUSE TO ALLOW THE VESSEL TO PERFORM AS PROVIDED IN (A) AND (B) IF IN HIS REASONABLE OPINION IT IS NOT SAFE SO TO DO.

D)      THE OWNERS SHALL BE ENTITLED TO INSURE ANY DEDUCTIBLE UNDER THE VESSEL'S HULL POLICY AND THE CHARTERERS SHALL REIMBURSE THE OWNERS ANY ADDITIONAL PREMIUM(S) REQUIRED BY THE VESSEL'S UNDERWRITERS AND/OR THE COST OF INSURING ANY DEDUCTIBLE UNDER THE VESSEL'S HULL POLICY.

E)      THE CHARTERERS SHALL FURTHER INDEMNIFY THE OWNERS FOR ANY COSTS, DAMAGE AND LIABILITIES RESULTING FROM SUCH OPERATION. THE VESSEL SHALL REMAIN ON HIRE FOR ANY TIME LOST INCLUDING PERIOD FOR REPAIRS AS A RESULT OF SUCH OPERATION.

## CLAUSE 52: GRAIN LOADING

THE VESSEL IS SUITABLE FOR CARRYING FULL CARGOES OF HEAVY GRAIN IN BULK IN ALL HOLDS  WITHOUT REQUIRING ANY SECURING ARRANGEMENT, BUT WITHIN ALLOWANCE AS SPECIFIED IN THE GRAIN LOADING MANUAL .FOR THE CARRIAGE OF GRAIN IN BULK THE VESSEL TO HAVE ON BOARD AT ANY TIME OF THIS CHARTER PERIOD VALID DOCUMENTS AND CERTIFICATES ISSUED BY A RECOGNIZED CLASSIFICATION SOCIETY ON THE BASIS OF SOLAS 1974.

FURTHERMORE, THE VESSEL ON BOARD APPROVED TABLE OF HEALING MOMENTS FOR FILLED HOLDS-UNTRIMMED ENDS'' IN ACCORDANCE WITH SOLAS 1974.

# Additional Clauses to MV"VOLISSOS POWER" Charter Party dated 22ND JUNE, 2008

**CLAUSE 53: DELETED**

**CLAUSE 54:**

IF RICE TO BE LOADED OWNERS MAY ARRANGE FOR PRE-SHIPMENT AND OUT TURN SURVEY OF SUCH CARGOES TO BE HELD BY THE OWNERS P AND I CLUB REPRESENTATIVES. A COPY OF THE REPORT TO BE ATTACHED FIRMLY TO THE BILL(S) OF LADING. COST OF SUCH SURVEYS TO BE FOR OWNERS ACCOUNT. FURTHERMORE OWNERS SHALL ENDEAVOUR FOR SUCH SURVEY NOT TO INTERFERE WITH CHARGES CARGO WORK.

**CLAUSE 55:**

FIRST HIRE SHOULD BE PAID WITHIN THREE BANKING DAYS AFTER VESSELS DELIVERY. FINAL SETTLEMENT WILL BE MADE WITH IN 10 DAYS AFTER VESSEL REDELIVERY.

CHARTERERS MAY DEDUCT OWNERS EXPENSES BUT MAXIMUM US$500 PER EACH CALLING PORT FROM THE LAST HIRE PAYMENT. CHARTERERS TO FORWARD VOUCHERS FROM SUCH EXPENSES AS SOON AS POSSIBLE BUT IN ANY CASE LATEST SIX MONTHS AFTER DEPARTURE FROM THE PORT IN QUESTION .

**CLAUSE 56: DELETED**

**CLAUSE 57:**

ON ARRIVAL AT LOAD PORT, VESSELS HOLDS TO BE CLEAN, SWEPT WASHED DOWN BY FRESH WATER, DRIED UP SO AS TO RECEIVE CHARTERERS INTENDED CARGO IN ALL RESPECTS FREE OF SALT, RUST SCALE  AND PREVIOUS CARGO RESIDUES TO THE SATISFACTION OF THE RELEVANT SURVEYORS.

SHOULD THE VESSEL NOT BEEN APPROVED BY THE SURVEYORS THEN THE VESSEL TO BE PLACED OFF-HIRE  PRORATA TO THE NUMBER OF HOLDS IF USED FROM FAILURE OF INSPECTIONS UNTIL VESSEL IS FULLY ACCEPTED AND ANY DIRECTLY RELATED EXPENSES THEREOF TO BE FOR OWNERS ACCOUNT.

**CLAUSE 58:**

OWNERS GUARANTEE THAT THE VESSEL IS SINGLE DECK, SELF TRIMMING, AND BULK CARRIER WITH ENGINE /BRIDGE AFT.

**CLAUSE 59:**

HATCH COVERS ARE ELECTRO-HYDRAULIC OPERATED.

**CLAUSE 60:**

OWNERS GUARANTEE THAT VESSEL IS SUITABLE FOR WORLD WIDE TRADING INCLUDING BANGLADESH WITH AHL/WWF/ITF IN GOOD ORDER.

**CLAUSE 61:-**

## Additional Clauses to MV"VOLISSOS POWER" Charter Party dated 22ND JUNE, 2008

OWNERS GUARANTEE THAT VESSEL IS FLAT AND SUITABLE FOR GRAB DISCHARGE AS FAR AS A BULK CARRIER OF HER TYPE CAN BE.

**CLAUSE 62:-**

CHARTERERS ARE ALLOWED TO USE BULLDOZERS/FORKLIFT WITH RUBBER TYRES IN VESSEL'S MAIN HOLDS  SUBJECT TO VESSEL'S TANK TOP STRENGTH.

**CLAUSE 63:-**

**DELETED**

**CLAUSE 64:-**

OWNERS GUARANTEE THAT VESSEL HATCH COVERS ARE TO BE WATERTIGHT ALL THROUGH THIS CHARTER PERIOD AND IF ANY HATCH COVER FOUND DEFECTIVE, SAME TO BE RECTIFIED AT OWNERS TIME AND EXPENSE TO CHARTERERS SATISFACTION EXCEPT IN HATCH COVERS DAMAGED BY STEVEDORES WHICH CASE REPAIRS AND TIME FOR CHARTERERS ACCOUNT.

**CLAUSE 65:-**

OWNERS GUARANTEE THAT VESSEL'S HOLDS ARE CLEAR OF ANY FITTINGS /SUPER STRUCTURES SUCH AS CAR DECK CURTAIN PLATES WHATSOEVER.

**CLAUSE 66:-**

IF REQUESTED BY CHARTERERS OWNERS/MASTER TO AUTHORIZE CHARTERERS OR THEIR AGENT TO SIGN ORIGINAL BILL(S) OF LADING IF REQUIRED BY CHARTERERS, ALWAYS IN ACCORDANCE WITH MASTERS RECEIPT.

AND CHARTERERS WILL REQUIRE MASTER TO AUTHORIZE AGENT TO SIGN ORIGINAL BILL(S) OF LADING THIS VOYAGE.

**CLAUSE 67:-**

OWNERS TO ALLOW  CHARTERERS TO DISCHARGE CARGO WITHOUT PRESENTATION OF ORIGINAL BILL(S) OF LADING BY PROVIDING OWNERS WITH L.O.I IN ACCORDANCE  WITH OWNERS P AND I CLUB  FORM AND WORDING BEFORE DISCHARGING. L.O.I TO BE SIGNED BY CHARTERERS ONLY.

**CLAUSE 68:-**

VESSEL HAS TO COMPLY WITH ALL REGULATIONS/REQUIREMENTS AT PORT OF CALL FURTHERMORE OWNERS GUARANTEE THAT VESSEL IS FREE OF ANY ASIAN GYPSY MOTH EGGS OR LARVAE OR ANY FORM OF ASIAN GYPSY LIFE.

**CLAUSE 69:-**

STANDARD BIMCO ISM/Y2K CLAUSE TO APPLY DURING THIS CHARTER PERIOD.

**CLAUSE 70:-**

## Additional Clauses to MV"VOLISSOS POWER" Charter Party dated 22ND JUNE, 2008

FOR HIRE CALCULATION PURPOSES, G.M.T. TO BE APPLIED FOR DELIVERY /REDELIVERY TIMES

**CLAUSE 71:** BIMCO ISPS CLAUSE FOR TIME CHARTER PARTIES:

A) (I) FROM THE DATE OF COMING INTO FORCE OF THE INTERNATIONAL CODE FOR THE SECURITY OF SHIPS AND OF PORT FACILITIES AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) IN RELATION TO THE VESSEL AND THEREAFTER DURING THE CURRENCY OF THIS CHARTER PARTY, THE OWNERS SHALL PROCURE THAT BOTH THE VESSEL AND "THE COMPANY" (AS DEFINED BY THE ISPS CODE) SHALL COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE RELATING TO THE VESSEL AND THE COMPANY. UPON REQUEST THE OWNERS SHALL PROVIDE A COPY OF THE RELEVANT INTERNATIONAL SHIP SECURITY CERTIFICATE (OR THE INTERIM INTERNATIONAL SHIP SECURITY CERTIFICATE) TO THE CHARTERERS. THE OWNERS SHALL PROVIDE THE CHARTERERS WITH THE FULL STYLE CONTACT DETAILS OF THE COMPANY SECURITY OFFICER (CSO).

(II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE OR DELAY, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE PART OF THE OWNERS OR THE COMPANY TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE OR THIS CLAUSE SHALL BE FOR THE OWNERS' ACCOUNT.

(B) (I) THE CHARTERERS SHALL PROVIDE THE CSO AND THE SHIP SECURITY OFFICER (SSO)/MASTER WITH THEIR FULL STYLE CONTACT DETAILS AND, WHERE SUB-LETTING IS PERMITTED UNDER THE TERMS OF THIS CHARTER PARTY, SHALL ENSURE THAT THE CONTACT DETAILS OF ALL SUB-CHARTERERS ARE LIKEWISE PROVIDED TO THE CSO AND THE SSO/MASTER. FURTHERMORE, THE CHARTERERS SHALL ENSURE THAT ALL SUB-CHARTER PARTIES THEY ENTER INTO DURING THE PERIOD OF THIS CHARTER PARTY CONTAIN THE FOLLOWING PROVISION:

THE CHARTERERS SHALL PROVIDE THE OWNERS WITH THEIR FULL STYLE CONTACT DETAILS AND, WHERE SUB-LETTING IS PERMITTED UNDER THE TERMS OF THE CHARTER PARTY, SHALL ENSURE THAT THE CONTACT DETAILS OF ALL SUB-CHARTERERS ARE LIKEWISE PROVIDED TO THE OWNERS.

(II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE OR DELAY, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE PART OF THE CHARTERERS TO COMPLY WITH THIS CLAUSE SHALL BE FOR THE CHARTERERS' ACCOUNT.

(C) NOTWITHSTANDING ANYTHING ELSE CONTAINED IN THIS CHARTER PARTY ALL DELAY,COSTS OR EXPENSES WHATSOEVER ARISING OUT OF OR RELATED TO SECURITY REGULATIONS OR MEASURES REQUIRED BY THE PORT FACILITY OR ANY RELEVANT AUTHORITY IN ACCORDANCE WITH THE ISPS CODE INCLUDING, BUT NOT LIMITED TO, SECURITY GUARDS, LAUNCH SERVICES, TUG ESCORTS, PORT SECURITY FEES OR TAXES AND INSPECTIONS, SHALL BE FOR THE CHARTERERS' ACCOUNT, UNLESS SUCH COSTS OR EXPENSES RESULT SOLELY FROM THE OWNERS' NEGLIGENCE. ALL MEASURES REQUIRED BY THE OWNERS TO COMPLY WITH THE SHIP SECURITY PLAN SHALL BE FOR THE OWNERS' ACCOUNT.

(D) IF EITHER PARTY MAKES ANY PAYMENT, WHICH IS FOR THE OTHER PARTY ACCOUNT ACCORDING TO THIS CLAUSE, THE OTHER PARTY SHALL INDEMNIFY THE PAYING PARTY.

## Additional Clauses to MV"VOLISSOS POWER" Charter Party dated 22ND JUNE, 2008

**CLAUSE 72:-**

VESSELS CRANES ARE TO BE FULLY OPERATIONAL FOR DUARTION OF CHARTER.IN CASE CRANES ARE NOT FUNCTIONAL OWNERS RESPONSIBLE TO PROVIDE SHORE CRANES IF REQUIRED

**CLAUSE 73:OWNERS AGENT**

CHARTERERS AGENTS AT THE VARIOUS PORTS OF CALL TO TAKE CARE OF ROUTINE VESSEL'S BUSINESS INCLUDING CREW CHARGES (OWNERS AGREE TO PAY CHARTERERS AGENTS THE SPECIFIC FEE FOR CREW CHANGE) AND MEDICAL ATTENTION, WATER SUPPLY, DELIVERY OR CASH WITHOUT CHARGING OWNERS ANY AGENCY FEE, BUT ONLY THE ACTUAL COST OF ANY SERVICES AND ACTUAL EXPENSES INCURRED.

FOR EXCEPTIONAL ITEMS, E.G. GENERAL AVERAGE /DRY DOCKING /MAJOR REPAIRS, OWNERS EITHER TO PAY CHARTERERS AGENTS AN AGENCY FEE AS PER TARIFF OR APPOINT THEIR OWN AGENTS.

**CLAUSE 74: EXTRA WORK**

THE FOLLOWING TO BE CONSIDERED CUSTOMARY SERVICE WHICH IS TO BE RENDERED PROVIDED PORT REGULATIONS PERMIT, OTHERWISE SHORE HANDS TO BE EMPLOYED FOR CHARTERERS ACCOUNT:-

1) SUPERVISION OF LOADING AND DISCHARGING
2) PREPARING OF HATCHES AND GEAR AS MUCH AS POSSIBLE PRIOR TO ARRIVAL AT PORTS OF COMMENCEMENT OF OPERATIONS.
3) OPENING AND CLOSING OF HATCHES.
4) MAINTAINING POWER WHILE LOADING AND/OR DISCHARGING AND CARE FOR WINCHES /CRANES.

**CLAUSE 75: -**

OWNERS CONFIRM VESSEL'S HOLD DIMENSIONS GIVEN ON CLEAR AND USABLE BASIS.

**DISPONENT OWNERS**

NOTOS NAVIGATION OVERSEAS.

S.A PANAMA

**CHARTERERS**

DEOL MARINE SERVICES

NEW DELHI

EXHIBIT 2

27-JUN-2008 16:52 From:DEOL MARINE SERVICES 0091 11 42460882    To:00911242006230    P.1
27-JUN-2008 16:49 FROM:SBM NAYA BAZAR      01123929410          TD:28315963          P.1
Message History Report                                                              Page 1 of 2

STATE BANK OF MYSORE NAVABAZAR DELHI

User Id   : SRI
Report Id : 20080627165946                     Date  : 2008/06/27 16:59:46
                                               IFSC  : SBMY0000321

Message History Report

(DUPLICATE COPY)

OUTGOING MESSAGE

Message Sender Reference          :
Sender Sequence Number            : 10635
Message Type                      : MT 103
                                    (Single Customer Credit Transfer)
Receiver Address                  : CHASUS33
                                    (JPMORGAN CHASE BANK, N.A. NEW YORK,NY)
Message Receiver Reference         :
Messages User Reference (MUR)     : SBMYINBB32110635
Non-Delivery Warning Requested    : NO
Delivery Notification Requested   : NO
Obsolescence Period (hh:mm)       :
Message Status                    : TO BE VERIFIED
Creator's UserId                  : SRI
Verifier's UserId                 :
Authorizer's UserId               :

20  Transaction Reference Number
    Sender's Reference            : IVAAIVBI2VVVV6V22
23B Bank Operation Code
    Bank Operation Code           : CRED
32A Value Date/Currency/Interbank Settled Amount
    Amount                        : 4,31,582.50
32B Currency/Instructed Amount
    Currency                      : USD
    Amount                        : 4,31,582.50
50K Ordering Customer
    Account                       : /54035525006
    Name & Address                : M/S KANNU EXPORTS
                                    NAYA BAZAR
                                    DELHI -110006
                                    INDIA
52A Ordering Institution
    BIC                           : SBMYINBB321
                                    STATE BANK OF MYSORE NAYABAZAR DELHI
56A Intermediary Institution
    BIC                           : IRVTUS3N



UN-2009 16:50 From:DEOL MARINE SERVICES 0091 11 42460882    To:009112428062300    P.2

27-JUN-2009 16:51  FROM:SDM NAYA BAZAR        01123329410        TO:28315963        P.2
                                                                                  Page 2 of 2
Message History Report

                        BANK OF NEW YORK NEW YORK,NY

    57A Account With Institution    : PIRBGRAA
        BIC                           PIRAEUS BANK SA ATHENS

    59  Beneficiary Customer          : /GR 49017270200057020350501701
        Account                       : NOTOS NAVIGATION OVERSEAS SA
        Name & Address
    70  Remittance Information        : OCEAN FREIGHT PAYMENT
        Narrative
    71A Details Of Charges            : SHA
        Code

    Creation Date    : 2009/06/27          Creation Time    : 16:59:17

                        **End of Report**

STATE BANK OF MYSORE NAYABAZAR DELHI

User Id  : SRI                          Date  : 2008/08/04 14:14:12
Report Id : 20080804141412              IFSC  : SBMY0000321

Message Report

OUTGOING MESSAGE

Message Sender Reference              :
Sender Sequence Number                : 10874
Message Type                          : MT 103
                                        (Single Customer Credit Transfer)
Receiver Address                      : CHASUS33
                                        (JPMORGAN CHASE BANK, N.A. NEW
                                        YORK,NY)
Messages User Reference (MUR)         : SBMYINBB32110874
Non-Delivery Warning Requested        : NO
Delivery Notification Requested       : NO
Obsolescence Period (hh:mm)           :
Message Status                        : TO BE VERIFIED
Creator's UserId                      : SRI
Verifier's UserId                     :
Authorizer's UserId                   :

20  Transaction Reference Number
    Sender's Reference                : 4032108TS0002104
23B Bank Operation Code
    Bank Operation Code               : CRED
32A Value Date/Currency Code/Interbank Settled Amount
    Date                              : 20080804
    Currency                          : USD
    Amount                            . 2,49,636.50
33B Currency/Instructed Amount
    Currency                          : USD
    Amount                            : 2,49,636.50
50K Ordering Customer
    Account                           : /54035525096
    Name & Address                    : KANNU EXPORTS
                                        : 4098, NAYABAZAR
                                        : DELHI -110006
                                        ' INDIA
52A Ordering Institution
    BIC                               : SBMYINBB321
                                        STATE BANK OF MYSORE NAYABAZAR DELHI
56A Intermediary Institution
    BIC                               : IRVTUS3N
                                        BANK OF NEW YORK NEW YORK,NY
57A Account With Institution
    BIC                               : PIRBGRAA

4-AUG-2008 14:46   FROM:SBM NAYA BAZAR        01123929410         TO:28315963        P.2

Message Report                                                                    Page 2 of 2

      59   Beneficiary Customer            PIRAEUS BANK SA ATHENS
           Account
           Name & Address              : /GR49 01727020 0057 0203 5850 701
                                       : NOTOS NAGIGATION OVERSEAS S.S. GREE
                                       : CE

      70   Remittance Information
           Narrative                   : FREIGHT PAYMENT AGAINST VESSEL NAME
                                       : M/V VOLISSOS KKD TO CHITTAGONG
                                       : (BANGLADESH) 23500 MT RICE

      71A  Details Of Charges
           Code                        : SHA

      Creation Date   :  2008/08/04          Creation Time   :  14:14:01


                        **End of Report**

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

NOTOS NAVIGATION OVERSEAS S.A.

                                        Plaintiff,          09 CV

-v-

DEOL MARINE SERVICES; SHIVNATH          **ATTORNEY'S DECLARATION**
RAI HARNARAIN (INDIA) LTD., A/K/A SHRI  **THAT DEFENDANT CANNOT BE**
LALMAHAL LTD; and KANNU EXPORTS         **FOUND IN THE DISTRICT**


                                        Defendants.
------------------------------------------------------------------x

This declaration is executed by **George M. Chalos, Esq.,** counsel for the Plaintiff,

NOTOS NAVIGATION OVERSEAS S.A, in order to secure the issuance of a Summons and Process of

Maritime Attachment and Garnishment in the above-entitled, in personam, Admiralty cause.

Pursuant to 28 U.S.C. §1746, **George M. Chalos, Esq.,** declares under the penalty of perjury:

I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiff in the above referenced matter.

I am familiar with the circumstances of the Verified Complaint, and I submit this declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment and Garnishment of the property of the defendants, DEOL MARINE SERVICES; SHIVNATH RAI HARNARAIN (INDIA) LTD, A/K/A SHRI LALMAHAL LTD; and KANNU EXPORTS, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

I have personally inquired or have directed inquiries into the presence of the defendants in this District.

Chalos & Co. Ref: 2142.001

I have personally checked with the office of the Secretary of State of the State of New York, using the Secretary of State's Division of Corporations database, and I have determined that, as of September 17, 2009, the defendants is not incorporated pursuant to the laws of New York, and have not nominated any agent for the service of process within the Southern District of New York.

I have inquired of Verizon Telephone Company whether the defendants can be located within this District. The Verizon Telephone Company has advised me that the defendants does not have any telephone number listings within this District.

I have further consulted with several other telephone directories on the internet, and I have found no separate telephone listings or addresses for the defendants within this District.

I have engaged in a Google search as to whether the defendants can be located within this District. The Google search results did not provide any information that defendants are found in this District.

I am unaware of any general or managing agent(s) within this District for the defendants.

In that I have been able to determine that the defendants has not appointed an agent for service of process within the Southern District of New York and that I have found no indication that the defendants can be found within this District for the purposes of Rule B, I have formed a good faith belief that the defendants does not have sufficient contacts or business activities within this District and does not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my own investigation that the defendants, DEOL MARINE SERVICES; SHIVNATH RAI HARNARAIN (INDIA) LTD, A/K/A SHRI LALMAHAL LTD; and KANNU EXPORTS,, cannot be found within this District for the purposes of Rule B of the

Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil

Procedure.


Dated: Oyster Bay, New York
          September 17, 2009

                                    CHALOS & CO, P.C.
                                    Attorneys for Plaintiff
                                    NOTOS NAVIGATION OVERSEAS S.A.

                  By:    _____
                                    George M. Chalos (GC-8693)
                                    123 South Street
                                    Oyster Bay, New York 11771
                                    Tel: (516) 714-4300
                                    Fax: (866) 702-4577
                                    Email: gmc@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
NOTOS NAVIGATION OVERSEAS S.A

                                    Plaintiff,              09 CV

          -v-
DEOL MARINE SERVICES; SHIVNATH              **VERIFICATION OF**
RAI HARNARAIN (INDIA) LTD a/k/a SHRI        **COMPLAINT**
LALMAHAL LTD; and KANNU EXPORTS

                                    Defendants.
-----------------------------------------------------------------x

          Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of

perjury:

          1.        I am a Member of the law firm of CHALOS & CO, P.C., counsel for the

Plaintiff, NOTOS NAVIGATION OVERSEAS S.A herein;

          2.        I have read the foregoing Verified Complaint and know the contents thereof; and

          3.        I believe the matters to be true based on documents and information obtained

from employees and representatives of the Plaintiff through its agents, underwriters and attorneys.

          4.        Attached hereto is the Declaration of Mr. Stefanos Liovaros, the President and

Director of NOTOS NAVIGATION OVERSEAS S.A., affirming and verifying the contents of

the Verified Complaint.

          I declare under penalty of perjury that the foregoing is true and correct.

Dated:  Oyster Bay, New York
         September 17, 2009

                              CHALOS & CO, P.C.
                              Attorneys for Plaintiff
                              Notos Navigation Overseas S.A,

          By:       _____
                              George M. Chalos (GC-8693)
                              123 South Street
                              Oyster Bay, New York 11771
                              Tel: (516) 714-4300
                              Fax: (516) 750-9051
                              Email: gmc@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

NOTOS  NAVIGATION OVERSEAS S.A

                                  Plaintiff,              09 CV

-v-                                                       **VERIFIED COMPLAINT**

DEOL MARINE SERVICES ;  SHIVNATH
RAI HARNARAIN (INDIA) LTD, a/k/a SHRI
LALMAHAL LTD; and  KANNU EXPORTS

                                  Defendants.
-------------------------------------------------------------------x

## DECLARATION OF PRINCIPAL

I, Stefanos Liovaros, pursuant to Section 1746 of Title 18 of the United States Code,

hereby declare and say the following under penalty of perjury:

1.  I am an individual of sound mind and body, and have never been convicted of a crime of

moral turpitude.

2.  This declaration is respectfully submitted in support of Plaintiff's *ex parte* Rule B

attachment application and Verified Complaint.

I am a citizen of Greece and a resident of Chios Island, I am the President / Director of

NOTOS  NAVIGATION OVERSEAS S.A.

3.  I make this declaration based upon my personal knowledge, official company records, my

own investigation and discussions with our legal advisors.

4.  I have read the Verified Complaint prepared by our New York attorneys, CHALOS &

CO., P.C., know the contents thereof, and hereby declare that the facts and damages laid

out therein are true and accurate.

1

I hereby declare under the penalty of perjury under the laws of the United States of
America that the foregoing is true and accurate to the best of my knowledge.

Dated: September 15, 2009
    In:  Chios Island

Stefanos Liovaros
President / Director

2